UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

REGENTS OF THE UNIVERSITY OF
MICHIGAN,

        Plaintiff,

                           Case No.
vs.                           Hon.

MEDIMMUNE, LLC; MEDIMMUNE
VACCINES, INC.; ASTRAZENECA
BIOPHARMACEUTICALS, INC; AND
ASTRAZENECA PHARMACEUTICALS,
LP,

        Defendants.

_____/

J. Michael Huget (P39150)
Andrew W. Clark (P79165)
Yafeez S. Fatabhoy (P83064)
Honigman LLP
315 E. Eisenhower Pkwy, Ste. 100
Ann Arbor, MI 48104
734-418-4200
Attorneys for Plaintiff

_____/

**COMPLAINT**

The Regents of the University of Michigan (the "University of Michigan" or

the "University"), through their attorneys, Honigman, LLP, state as follows for their

complaint against Defendants MedImmune, LLC, MedImmune Vaccines, Inc.,

AstraZeneca Biopharmaceuticals, Inc., and AstraZeneca Pharmaceuticals, LP (Defendants collectively referred to herein as "AstraZeneca" except as stated):

## INTRODUCTION

1.     The University of Michigan is a world-renowned research institution. A core part of its mission is translating its faculty members' research discoveries into tangible applications that touch and improve human lives.  It often accomplishes this in collaboration with private sector businesses, like AstraZeneca. Through productive collaborations with industry partners, the University of Michigan's research has given rise to new therapeutics, vaccines, and medical devices that have improved care for hundreds of millions of patients worldwide.

2.     The University's School of Public Health is ranked among the top public health schools in the country, and has, for more than 80 years, been pursuing a healthier world through research, innovation, and education.  With more than 190 faculty and researchers across six academic departments and numerous collaborative centers and institutes, it generates new knowledge and innovations aimed at finding lasting solutions to pressing public health problems.

3.     This action arises out of the University of Michigan's contribution to one of AstraZeneca's most important and financially successful vaccine products: FluMist®.

4.     The development of FluMist® is a story of scholarship and achievement in which the University of Michigan plays a critical role.

5.     It is also a story of substantial commercial profit and ongoing potential for market expansion, nearly all of which has redounded to AstraZeneca's bottom line.

6.     FluMist® is a live attenuated influenza vaccine that is administered as a nasal spray rather than an injection.  It was directly created based on virus strains developed at the University of Michigan's School of Public Health, and licensed to AstraZeneca's predecessor in interest as part of a detailed commercial and development agreement. FluMist® was approved by the United States Food and Drug Administration ("FDA") in 2003.

7.     The University provided these strains—its physical property—to AstraZeneca so that AstraZeneca could use them to develop and make a commercially available vaccine, and then use them within that vaccine.  In return, the University would earn a small royalty, but would also get the strains back, along with any improvements related to the commercial vaccine product, when the parties' agreement ended.

8.     But after decades of using the University's physical property and know-how to drive billions of dollars of FluMist® sales, AstraZeneca has not only

3

absconded with the University's property and continued to use it unlawfully but has also flagrantly violated its contractual obligations to the University.

9.      This is a dispute arising out of the University's rights to control its own personal property.  The University has independent (a) contractual rights and (b) tort rights that AstraZeneca has violated in connection with that personal property.

10.      Ultimately, the University is entitled to damages, specific performance, and injunctive relief requiring AstraZeneca to deliver the unique property it owes to the University and to stop using the University's property unlawfully for its own commercial purposes.  AstraZeneca must also disgorge all profits and benefits it received as a result of its unlawful use of the University's property.

**PARTIES, JURISDICTION, AND VENUE**

11.      The University of Michigan is a constitutional corporation of the State of Michigan, and is based in Ann Arbor, Michigan.  The University is a citizen of the State of Michigan.

12.      MedImmune, LLC is a Delaware limited liability company with an address at One MedImmune Way, Gaithersburg, MD 20878. MedImmune, LLC is fully or partially liable for the claims asserted by the University. MedImmune, LLC is listed on FDA correspondence as the FluMist® manufacturer. MedImmune, LLC is also listed as an assignee to a 2011 Amendment to the Agreement (as defined

4

below) and has provided royalty reports to the University, pursuant to the terms of the Agreement, as recently as 2023. Additionally, MedImmune, LLC is listed as the "Current Owner" of the trademark registration for "FLUMIST" "and "FLUMIST QUADRILVALENT" with the United States Patent and Trademark Office. Upon information and belief, no member is a citizen of the state of Michigan.

13.    MedImmune Vaccines, Inc. is a Delaware corporation with an address at 319 Bernardo Avenue, Mountain View, CA 94043. MedImmune Vaccines, Inc. is fully or partially liable for the claims asserted by the University. MedImmune Vaccines, Inc. is listed as an assignee to a 2007 document relating to the Agreement and has paid royalties pursuant to the Agreement. MedImmune Vaccines, Inc. is a citizen of Delaware and California.

14.    AstraZeneca Biopharmaceuticals, Inc. is a Delaware corporation with an address at 1800 Concord Pike P.O. Box 15437 Wilmington, DE 19850. AstraZeneca Biopharmaceuticals, Inc. is fully or partially liable for the claims asserted by the University. AstraZeneca Biopharmaceuticals, Inc., on information and belief, is responsible for AstraZeneca's vaccine business line and is the corporate owner and parent of the MedImmune entities listed in paragraphs 12 and 13, above. Additionally, on information and belief, AstraZeneca Biopharmaceuticals, Inc. is the entity responsible for the manufacture and

distribution of the FluMist® product. AstraZeneca Biopharmaceuticals, Inc. is a citizen of Delaware.

15.     AstraZeneca Pharmaceuticals, LP is a Delaware Limited Partnership with an address at 1209 Orange Street, Wilmington, DE 19801. AstraZeneca Pharmaceuticals, LP is fully or partially liable for the claims asserted by the University. AstraZeneca Pharmaceuticals, LP assumed responsibility for corresponding and negotiating with the University relating to the Agreement and, on information and belief, has full or partial responsibility for performance under the terms of the Agreement. AstraZeneca Pharmaceuticals, LP, 1800 Concord Pike, A2C, Wilmington, DE 19850 is the listed as the "Correspondent Name/Address" for the trademark registration for "FLUMIST" and "FLUMIST QUADRIVALENT" with the United States Patent and Trademark Office. Upon information and belief, no partner is a citizen of Michigan.

16.     AstraZeneca consented, by contract, to personal jurisdiction in this Court.  Further, AstraZeneca sells FluMist® within the State of Michigan (including to the University), and this dispute arises out of the University's physical property which was developed in this jurisdiction.

17.     This Court has subject matter jurisdiction over this dispute under 28 U.S.C. § 1332(a)(1) and (2) because no Defendant is a citizen of the same state as

6

the University and the amount in controversy, exclusive of interest and costs, exceeds $75,000.

18.     Venue is proper in this Court under 28 U.S.C. § 1391 because a substantial portion of the events or omissions giving rise to the claim occurred in this judicial district and because AstraZeneca consented to venue in this Court and is subject to this Court's personal jurisdiction.

## FACTUAL ALLEGATIONS

### The University develops the "Master Strains"

19.     Dr. Hunein "John" Maassab joined the University of Michigan as a Ph.D. student in 1952. He remained at the University in its Department of Epidemiology at the School of Public Health for his entire career and made it his mission to develop the world's first cold-adapted, live-attenuated influenza virus vaccine.

20.     Over his four-decade career, Dr. Maassab became world-renowned for his groundbreaking discoveries. The University has multiple programs honoring his contributions, including student awards and an endowed professorship.

21.     Dr. Maassab's work was inspired by the development of the polio vaccine, and he wanted to make a similar contribution to combat the influenza virus,

including by making the vaccine easier to administer and store, as well as more effective.

22.     Dr. Maassab's key contributions were his development of cold-adapted flu strains and the associated know-how to use the strains to create vaccines.

23.     In his 2014 obituary, one of Dr. Maassab's colleagues recalled, "[f]or several decades, John was totally committed and fully absorbed by his search for an effective and safe live vaccine for influenza.  He set his mind on this goal in the mid-1950s after he witnessed the national press conference on the Salk Polio Vaccine by Thomas Francis on this campus."

24.     To fully realize that goal, however, Dr. Maassab's work would have to extend beyond the University laboratory and into the commercial markets.

25.     Consistent with its research-oriented mission, the University sought a partner to commercialize Dr. Maassab's work and develop an effective influenza vaccine that would be available around the world.

### *The University finds a commercial partner to make a vaccine from the "Master Strains"*

26.     In 1995, the University selected Aviron, Inc. ("Aviron") as its commercial partner.

27.     As noted below, Aviron was ultimately acquired by the AstraZeneca entities.

28.     The University and Aviron—AstraZeneca's predecessor[1] —executed a Materials Transfer and Intellectual Property Agreement dated February 24, 1995 (the "Agreement"), attached to this Complaint as Exhibit 1.

29.     Broadly, the Agreement gives access to two of the most valuable, cold-adapted influenza virus strains and associated know-how developed by Dr. Maassab.[2] These licensed influenza virus strains are referred to in the Agreement as the "Master Strains."

30.     In other words, the University was letting AstraZeneca leverage its property to bring a commercial product to market.

31.     AstraZeneca committed to using the virus strains and know-how it received from the University to develop and commercialize influenza vaccines.

---

[1] For the purposes of clarity, all additional references in this Complaint to the University's counterparties under the Agreement will be to AstraZeneca, unless context requires specific reference to Aviron or Medimmune.

[2] Dr. Maassab's co-inventor on the licensed virus strains was Dr. M. Louise Herlocher.

32.     Once AstraZeneca developed such a product and brought it to market, it would have 20 years from the date it first sold the product to use and improve upon the University's property, during which it would pay royalties to the University.

33.     Upon expiration of that 20-year period, AstraZeneca had to choose between either (a) negotiating to extend the right to use the property or (b) stopping its use of the property, returning it to the University, and turning over all the improvements AstraZeneca had made, among other things.

34.     Several specific provisions of the Agreement are critical to this dispute.

35.     The University granted AstraZeneca "the exclusive right, under any of MICHIGAN's rights in the MASTER STRAINS, KNOW-HOW and TECHNOLOGICAL DATA, to use MASTER STRAINS and to practice and use KNOW-HOW and TECHNOLOGICAL DATA solely to make, have made, use, market and sell, PRODUCTS in the TERRITORY." (Exhibit 1 at § 3.1.)[3]

36.     The virus strains developed by Dr. Maassab and lent to AstraZeneca are the "MASTER STRAINS": the "donor strains of influenza viruses Type A/Ann Arbor/6/60-H2N2 (7P1-SE2) and Type B/Ann Arbor/1/66 (7P1-SE2) developed by MICHIGAN's faculty member Dr. Maassab, and provided by MICHIGAN

---

[3] Terms identified in all-capitals are defined terms in the Agreement and, for consistency, the Complaint maintains that typographical convention."

hereunder, having the characteristics of and significant homology to the following six internal genes: nonstructural, matrix, nucleoprotein, and three polymerase genes, as described in <u>Virology</u>, v.167, pp 554-5647, 1988 and <u>Virology</u>, v.163, pp 429-443, 1988, respectively." (Exhibit 1 at § 2.6.) Section 1.2 of the Agreement provides "[AstraZeneca] acknowledges that the MASTER STRAINS are the property of MICHIGAN, held in confidence by and to be held in confidence for MICHIGAN."

37.    The Agreement further provides for rigorous confidentiality protections: "It is acknowledged that the MASTER STRAINS are confidential materials of MICHIGAN, pursuant to Article 16 below, and that unauthorized disclosure or transfer to third parties may result in financial detriment to MICHIGAN. AVIRON agrees to use its best efforts to limit use of all MASTER STRAINS for the purpose of manufacturing and commercializing PRODUCT in accordance with the terms of this Agreement, to treat the MASTER STRAINS as confidential pursuant to the terms of Article 16 below, and to limit access to the MASTER STRAINS to those of AVIRON's and its AFFILIATES' and SUBLICENSEES' employees reasonably requiring same for the purpose of manufacturing and commercialization of PRODUCTS, who further are obligated in writing to treat the MASTER STRAINS in a manner and to an equivalent extent as

provided herein with regard to confidentiality, use and non-disclosures." (Exhibit 1 at § 4.6.).

38.    Notably, the definition of "MASTER STRAINS," Section 1.2, and Section 4.6 all confirm that the MASTER STRAINS are the University's physical property and that AstraZeneca was required to hold them in confidence.

39.    As articulated in at least Section 3.1, Section 4.2, and Section 4.6, the Agreement's purpose was expressly and exclusively for AstraZeneca to develop the MASTER STRAINS into a "PRODUCT."

40.    Indeed, AstraZeneca committed to "use its best efforts (i) to develop PRODUCTS, obtain any government approvals necessary, and manufacture and sell PRODUCTS at the earliest possible date; (ii) to effectively exploit, market and manufacture in sufficient quantities to meet anticipated customer demand; and (iii) to make the benefits of the PRODUCTS reasonably available to the public." (Exhibit 1 at § 8.2.)

41.    "PRODUCTS" include, as relevant here, "any products which incorporate, or the manufacture, use or sale of which utilized MASTER STRAINS or KNOW-HOW. (PRODUCT example: any influenza vaccines produced from a reassortant virus resulting from the co-cultivation of at least one of the MASTER STRAINS and at least one wild type virus)."  (Exhibit 1 at § 2.11.)

42.     The Agreement would run from February 24, 1995, until the twentieth

anniversary of the first commercial sale of a PRODUCT.  (Exhibit 1 at § 15.1.)

43.     Once AstraZeneca commercialized a PRODUCT, it would pay

royalties to the University calculated as 1.25% of NET SALES of PRODUCTS.[4]

44.     Upon expiration of the Agreement, AstraZeneca had the right to notify

the University that it wished to negotiate a new license extending its rights to use the

MASTER STRAINS.

45.     Whether or not AstraZeneca decided to negotiate a new agreement,

upon the Agreement's expiration, under Section 15.5, AstraZeneca was required to

do all of the following:

    a.     Return the MASTER STRAINS, including any copies, to the
           University;

    b.     Provide the University all TECHNOLOGICAL DATA
           developed or obtained by [AstraZeneca];

    c.     Refrain from all further uses of KNOW-HOW and
           TECHNOLOGICAL DATA, except as specifically authorized.

46.     AstraZeneca was also required, upon expiration, to deliver any

IMPROVEMENTS to the University and grant the University "an irrevocable

---

[4] The royalty rate was 1.5% if the PRODUCT practiced one of the
University's patents, but no patents are at issue in this matter.

13

royalty-free right, with the right to sublicense that right, to use TECHNOLOGICAL DATA and IMPROVEMENTS of [AstraZeneca], AFFILIATES and SUBLICENSEES, only with regard to the manufacture, use or sale of PRODUCTS." (Exhibit 1 at § 15.6.)

47.     Importantly, the "IMPROVEMENTS" are "any patentable improvements or know-how relating to delivery mechanisms, administration processes and manufacturing processes for PRODUCTS and packaging, storage and preservation processes for the MASTER STRAINS developed by" AstraZeneca. (Exhibit 1 at § 2.3.)

48.     AstraZeneca has confirmed in public filings that "[p]ursuant to the [Agreement], the Company is required to grant to the University of Michigan an irrevocable, royalty-free license for research purposes, or for transfer to a subsequent licensee should the [Agreement] be terminated, to (i) all improvements developed by the Company, its affiliates or sublicensees, whether or not patentable. . ."

49.     The Agreement contains numerous other obligations, including various reporting obligations, that bind AstraZeneca.

***AstraZeneca ultimately assumes Aviron's contract obligations***

50.    Aviron was acquired by MedImmune in January 2002, and, upon information and belief, the Agreement was assigned by law or contract to MedImmune, which assumed all of Aviron's obligations.

51.    MedImmune was acquired by AstraZeneca in June 2007.

52.    Eventually, upon information and belief, AstraZeneca folded MedImmune's operations and assets into AstraZeneca's consolidated accounts.

53.    AstraZeneca is Aviron's successor under the Agreement and has assumed all of Aviron's rights and obligations under the Agreement.

### FluMist® receives FDA approval and becomes a commercial success

54.    AstraZeneca's commercial influenza vaccine, FluMist®, was developed using the MASTER STRAINS under the Agreement.

55.    FluMist® is a live attenuated influenza vaccine that is administered as a nasal spray rather than an injection.

56.    FluMist® uses a live, weakened virus to stimulate an immune response and protect against future infection with influenza.

57.    In 2003, FluMist® was approved by the FDA and brought to market for its first commercial sale.

58.    Its first approval was for use in individuals ages 5 to 49.  The FDA later expanded the approval to include children ages 2 to 5 years old.

59.    In late 2024, FluMist® received FDA approval for at-home administration by certain individuals without the need for a healthcare provider. Starting with the 2025 influenza season, AstraZeneca launched the FluMist® vaccine for home use, making it the first influenza vaccine without the need to be administered by a health care provider, and it was recognized in TIME Magazine 2024 Innovations of the Year.

60.    When FluMist® came to market in 2003, it fulfilled Dr. Maassab's goal of developing a cold-adapted, live-attenuated, influenza vaccine.

61.    The University issued a press release hailing the accomplishment and quoting Dr. Maassab: "I feel in a sense that I have accomplished my life's dream…I spent all my lifetime developing this vaccine." FDA APPROVES NASAL SPRAY FLU VACCINE INVENTED AT U-M, https://news.umich.edu/fda-approves-nasal-spray-flu-vaccine-invented-at-u-m/ (last visited August 20, 2025).

62.    FluMist® was made by combining the MASTER STRAINS with a "wild" strain of the circulating flu virus to create a new "reassortant" that has six of the genes from the MASTER STRAINS and two from the wild strain.

63.    Unquestionably, FluMist® constituted a "PRODUCT" under the Agreement when it was released in 2003.

64.     On January 21, 2004, AstraZeneca reported to the University that it had begun making sales of FluMist® in the third quarter of 2003.  It began making royalty payments in the first quarter of 2004 once it began officially booking revenue from FluMist® sales.[5]

65.     AstraZeneca regularly made alterations to the FluMist® formulation after 2003, for example to target the strains of influenza viruses that are most likely to circulate in the upcoming flu season. But AstraZeneca continued to incorporate or utilize the MASTER STRAINS each year, and it continues to do so today.

66.     Importantly, FluMist® obtained its FDA approval based on its incorporation of the MASTER STRAINS, and AstraZeneca has never obtained FDA approval for FluMist® on any basis independent of its utilization of the MASTER STRAINS.

67.     AstraZeneca also developed IMPROVEMENTS, including "know-how relating to delivery mechanisms, administration processes and manufacturing

---

[5] AstraZeneca made its first FluMist sale sometime in September 2003 but cannot identify the precise date, and the parties ultimately agreed that the Agreement's original term ran through August 31, 2023.  AstraZeneca notified the University that it booked no revenue for FluMist in the third and fourth quarters of 2003 because the product was new and AstraZeneca was unable to predict return rates and rebates.  As a result, AstraZeneca claims it only began to realize "NET SALES" of FluMist in the first quarter of 2004.

processes" for FluMist® as well as "packaging, storage and preservation processes for the MASTER STRAINS."

68.     For example, at some point, AstraZeneca introduced a "plasmid rescue system" developed by St. Jude Children's Research Hospital to create the seasonal flu vaccines for FluMist®   The "plasmid rescue system" speeds up vaccine development in a given flu season.

69.     Upon information and belief, AstraZeneca provided samples of the MASTER STRAINS to St. Jude Children's Research Hospital. AstraZeneca failed to provide notice to the University of a sublicense of the MASTER STRAINS to St. Jude Children's Research Hospital, in violation of Sections 4.4, 4.6, and 10.2 of the Agreement.

70.     The use of the plasmid rescue system allows AstraZeneca to speed up vaccine creation—updating FluMist® for the annual flu season. But it does not displace the centrality of the MASTER STRAINS. It is just a new way of utilizing the MASTER STRAINS in conjunction with FluMist®. The process isolates and copies the relevant genes from the MASTER STRAINS and incorporates them into the vaccine—a more precise technique to achieve the same result as the original process. That is, it is an update to FluMist®'s commercial manufacturing process.

71.    Experts continue to recognize that FluMist® is created using the MASTER STRAINS.

72.    FluMist®, in all of its iterations and incarnations, is derived from, and continues to use, the MASTER STRAINS.

73.    AstraZeneca recognized this by its conduct and public statements over the course of two decades.

74.    The MASTER STRAINS have also been used to develop plasmids that are the subject of US Patent No. 7,465,456, US Patent No. 8,114,415, US Patent No. 8,574,591, US Patent No. 9,238,825, US Patent No. 8,247,207 and US Patent No. 8,652,822. Upon information and belief, these patents constitute IMPROVEMENTS under the Agreement.

75.    FluMist® necessarily continues to use the MASTER STRAINS even if AstraZeneca does not need to physically handle the MASTER STRAINS in connection with its annual updates to the vaccine.

### AstraZeneca pays royalties to the University

76.    FluMist® has been a commercial success.

77.    Its annual sales fluctuate but have recently been more than $200 million per year, which has resulted in billions of dollars in revenue over FluMist®'s lifecycle.

19

78.     AstraZeneca made quarterly sales reports to the University—
confirming that FluMist® is a PRODUCT as defined in the Agreement—in each
quarter, beginning in the third quarter of 2003 and not ending until the third quarter
of 2023, when the Agreement expired.

79.     For twenty years, AstraZeneca made monthly royalty payments to the
University based on its sales of FluMist® because FluMist® is a PRODUCT.

80.     Even at the University's below-market royalty rate of 1.25%, those
sales generated significant royalty revenue for the University to invest in its other
research endeavors.

81.     But AstraZeneca has made no royalty payment to the University since
September 2023, when AstraZeneca failed to enter into a new agreement.

82.     AstraZeneca's FluMist® revenues are, upon information and belief, set
to increase dramatically beginning in the 2025-2026 flu season because that is the
first season for which FluMist® has been approved for home use for certain patients
without the need to be administered by a health care professional.

83.     While patients will still need a prescription for FluMist®, the
convenience of self-administering the flu vaccine—compared to getting an injection
at a pharmacy or doctor's office—would be expected to generate record sales given

sales trajectories and the fact that AstraZeneca reports that there are now "one billion cases of seasonal influenza annually."

### *AstraZeneca violates the University's property rights and contract rights*

84.     Before the Agreement between the University and AstraZeneca was set to expire, AstraZeneca reached out to the University to negotiate extended access to the MASTER STRAINS.

85.     AstraZeneca realized that its FluMist® product continued to incorporate and utilize the MASTER STRAINS and that it required a license from the University to continue manufacturing and distributing the FluMist® vaccine.

86.     Specifically, in March of 2021, Dr. Caroline Austin, the Vice-President and Head of Transactions UK at AstraZeneca reached out to the University to secure an extension of the Agreement:



From: **Austin, Caroline** Caroline.Austin@astrazeneca.com
Subject: Contract between AstraZeneca and University of Michigan
Date: March 9, 2021 at 2:38 PM
To: Greg Choiniere: choinier@umich.edu

Dear Greg,

I have been given your e mail address by my colleague, Paulina Mazur, who liaises with you and the University in regard to royalty payments associated with a contract concerning Flumist.

"Materials Transfer and Intellectual Property Agreement between Aviron and University of Michigan effective 24 February 1995".

I am working with our team regarding Flumist for which the technology is used, and we would like to discuss extension of this contract.

Please could you confirm if I should liaise with you for this matter? If so it would be good to have a short call if possible.

Thanks for your help
Kind regards
Caroline

**Caroline E. Austin  PhD**
Vice-President and Head of Transactions UK

**AstraZeneca**
Business Development
Eastbrook House, Shaftesbury Road, Cambridge, CB2 8DU

M: +44 (0) 7771 730 543
caroline.austin@astrazeneca.com

87.     Dr. Austin admitted that the FluMist® product used the technology (i.e., the MASTER STRAINS) and that continued manufacture and sale of the product required an extension of the Agreement.

88.     The University cooperated in good faith with AstraZeneca to try and negotiate an agreement.

89.     However, AstraZeneca abandoned all discussions with the University and reversed its position, falsely claiming that the Agreement was irrelevant to FluMist®, that the University was improperly leveraging its "intellectual property,"

22

that FluMist® had long ago ceased to use the MASTER STRAINS, and that AstraZeneca had no need for the MASTER STRAINS on an ongoing basis.

90.   AstraZeneca continued to sell FluMist® after the Agreement's expiration but has refused to pay the University for use of the University's property.

91.   Of course, nothing about the FluMist® formulation intrinsically changed from (a) the last month in which the Agreement was in effect and AstraZeneca was paying royalties because FluMist® is a PRODUCT to (b) the first month after the Agreement expired and AstraZeneca stopped paying royalties even—though it continued to sell FluMist®.

92.   Once the Agreement expired, the University demanded return of the MASTER STRAINS.

93.   However, AstraZeneca refused to provide the MASTER STRAINS to the University.

94.   Despite its obligation to maintain the MASTER STRAINS and use them to develop PRODUCTS, AstraZeneca, shockingly, contended that it had ***lost*** the MASTER STRAINS.

95.   It has since claimed that it found ***something*** related to the MASTER STRAINS.

23

96.     Moreover, AstraZeneca has failed to turn over any IMPROVEMENTS to the University.

97.     Essentially, AstraZeneca has taken the position that it (a) does not need the MASTER STRAINS, (b) does not have the MASTER STRAINS, (c) has not used the MASTER STRAINS for years, and (d) has no IMPROVEMENTS to deliver to the University.

98.     Those assertions are wrong as a factual matter. But if they were not, they would still be concessions that AstraZeneca flagrantly violated its obligations under the Agreement.

99.     The reality is simpler. AstraZeneca has a successful commercial product in FluMist®. It wants to retain the revenue and profit from that product, but cut the University out of its share for its contribution. And AstraZeneca certainly does not want to provide the University with the IMPROVEMENTS because the University has the right to license them, which would threaten AstraZeneca's monopoly on FluMist®.

100.    Since the expiration of the Agreement, AstraZeneca has no right to continue using the MASTER STRAINS or incorporating them, in any way or to any extent, in FluMist®.

101.   Put simply, AstraZeneca is not allowed to continue marketing and selling FluMist® without the University's ongoing participation and permission, which AstraZeneca has failed to obtain.

102.   At present, AstraZeneca has both contract-based and independent tort-based obligations to the University based on the Agreement and AstraZeneca's continued possession of the MASTER STRAINS.

103.   AstraZeneca has breached those obligations.

104.   It continues to violate the University's property rights.

105.   And it continues to flout the University's contract rights.

106.   AstraZeneca's conduct—at all times intentional—has caused the University substantial damages, which the University estimates exceed $50 million before enhancement, interest, costs, or fees.

**COUNT I (COMMON LAW CONVERSION)**

107.   The University incorporates the foregoing allegations as if fully restated herein.

108.   The MASTER STRAINS and their derivatives are the University's personal property.

109.   AstraZeneca has physical possession of and dominion over the MASTER STRAINS, as well as other personal property provided to AstraZeneca.

25

110.   AstraZeneca's only prior entitlement to possess, retain, or use the MASTER STRAINS or any other University property delivered to AstraZeneca was a function of the Agreement.

111.   The Agreement has expired.

112.   AstraZeneca has no right to continued possession or use of the MASTER STRAINS.

113.   Nevertheless, and without any legal right or entitlement to do so, AstraZeneca has continued to use the MASTER STRAINS, or portions thereof, in connection with FluMist®.

114.   AstraZeneca has converted the University's property in denial of and inconsistent with the University's rights in the MASTER STRAINS.

115.   The University has suffered damages as a result of the conversion of its property.

116.   The University is entitled to relief, including damages, costs, and attorney fees, for the damages caused by AstraZeneca's conversion of the University's property.

117.   The University is also entitled to injunctive relief barring further possession and misuse of its property by AstraZeneca.

26

## COUNT II (STATUTORY CONVERSION UNDER MCL 600.2919(A))

118.    The University incorporates the foregoing allegations as if fully restated herein.

119.    The MASTER STRAINS and their derivatives are the University's personal property.

120.    AstraZeneca has physical possession of and dominion over the MASTER STRAINS, as well as other personal property provided to AstraZeneca.

121.    AstraZeneca's only prior entitlement to possess, retain, or use the MASTER STRAINS or any other University property delivered to AstraZeneca was a function of the Agreement.

122.    The Agreement has expired.

123.    AstraZeneca has no right to continued possession or use of the MASTER STRAINS.

124.    Nevertheless, and without any legal right or entitlement to do so, AstraZeneca has continued to use the MASTER STRAINS, or portions thereof, in connection with FluMist®.

125.    AstraZeneca has converted the University's property in denial of and inconsistent with the University's rights in the MASTER STRAINS in violation of MCL 600.2919(a).

27

126.   AstraZeneca's conversion is for its own use, namely, to continue manufacturing and distributing the FluMist® product.

127.   The University has suffered damages as a result of the conversion of its property.

128.   The University is entitled to relief, including statutory and treble damages, costs, and attorney fees, for the damages caused by AstraZeneca's conversion of the University's property.

129.   The University is also entitled to injunctive relief barring further possession and misuse of its property by AstraZeneca.

## COUNT III (TRESPASS TO CHATTELS)

130.   The University incorporates the foregoing allegations as if fully restated herein.

131.   The University has property and possessory rights to the MASTER STRAINS, their derivatives, and other personal property delivered to AstraZeneca.

132.   The University permitted AstraZeneca to take temporary possession of its personal property during the term of the parties' Agreement.

133.   The Agreement expired.

134.   AstraZeneca has no legal right or entitlement to possession or use of the University's personal property.

28

135.   AstraZeneca has intentionally interfered with the University's personal property, including the MASTER STRAINS, by failing to deliver it to the University, by disposing of it, or otherwise damaging it.

136.   AstraZeneca has also interfered with the University's property right by continuing to use the University's property for its own commercial benefit and profit.

137.   The University did not consent to AstraZeneca's interference with its personal property.   To the contrary, the University took steps to secure AstraZeneca's independent commitment that it would properly treat and handle the property while in AstraZeneca's possession, and AstraZeneca violated those commitments.

138.   The University has been damaged as a result of AstraZeneca's unlawful conduct.

139.   The University is entitled to compensation, including an order requiring AstraZeneca to disgorge all benefits and profits derived from the unlawful use of the University's property.

### COUNT IV (REPLEVIN/CLAIM AND DELIVERY)

140.   The University incorporates the foregoing allegations as if fully restated herein.

29

141. A cause of action for claim and delivery exists where the plaintiff has a right to possess goods or chattels which the defendant has unlawfully taken or detained. MCL 600.2920.

142. The University has a right to the present possession of all personal property it previously delivered to AstraZeneca. The Agreement under which that personal property was delivered has expired, and AstraZeneca has no possessory interest in the property, which includes the MASTER STRAINS.

143. The University's right to immediate possession is established by the facts and claims set forth herein.

144. AstraZeneca has wrongfully detained the University's personal property.

145. In addition, AstraZeneca has continued to use the University's personal property for its own profit and benefit.

146. The University has been damaged because AstraZeneca has unlawfully detained its personal property.

147. The University is entitled to compensation, including an order requiring AstraZeneca to disgorge all benefits and profits derived from the unlawful use of the University's property.

148. In addition, the University is entitled to an order requiring AstraZeneca to return the University's property and anything that property has been incorporated into.

## COUNT V (BREACH OF CONTRACT)

149. The University incorporates the foregoing allegations as if fully restated herein.

150. The Agreement is a valid and binding contract between the University and AstraZeneca.

151. The University has fulfilled all of its contractual obligations under the Agreement.

152. AstraZeneca has breached the Agreement in at least the following ways:

    a.    Failing to deliver IMPROVEMENTS to the University upon the Agreement's expiration;

    b.    Failing to deliver all TECHNOLOGICAL DATA to the University upon the Agreement's expiration;

    c.    Failing to use the MASTER STRAINS solely to make, use, and market PRODUCTS;

    d.    Failing to cease using the MASTER STRAINS and return them to the University.

> e.  Disclosing the MASTER STRAINS to unauthorized third parties, including St. Jude Children Hospital and Mount Sinai School of Medicine.

153. The University has been harmed by AstraZeneca's breaches of contract.

154. The University is entitled to damages as a result of AstraZeneca's breaches of contract.

155. The University is also entitled to specific performance of the Agreement because the IMPROVEMENTS and TECHNOLOGICAL DATA are unique property for which the University cannot be made whole solely by an award of money damages.

156. AstraZeneca must also provide a full and complete accounting of all of the IMPROVEMENTS and TECHNOLOGICAL DATA.

157. The University requests that the IMPROVEMENTS and TECHNOLOGICAL DATA be delivered to the University or placed in a constructive trust to preserve their value for the University pending a final order requiring their delivery.

### COUNT VII (BREACH OF CONTRACT - IN THE ALTERNATIVE)

158. The University incorporates the foregoing allegations as if fully restated herein.

159.   This Count is pled in the alternative and applies only to the extent that AstraZeneca ceased using the MASTER STRAINS in connection with FluMist® at some point during the Agreement's term.

160.   The Agreement is a valid and binding contract between the University and AstraZeneca.

161.   The University has fulfilled all of its contractual obligations under the Agreement.

162.   The Agreement requires AstraZeneca to use the MASTER STRAINS "only for the development, manufacture and sale of PRODUCTS."  (Exhibit 1 at § 4.2.)

163.   The Agreement requires AstraZeneca to "use its best efforts (i) to develop PRODUCTS, obtain any government approvals necessary, and manufacture and sell PRODUCTS at the earliest possible date; (ii) to effectively exploit, market and manufacture in sufficient quantities to meet anticipated customer demand; and (iii) to make the benefits of the PRODUCTS reasonable available to the public." (Exhibit 1 at § 8.2.)

164.   The Agreement requires AstraZeneca to "use its best efforts consistent with reasonable business practice to commercialize (or have commercialized

PRODUCTS designed and marketed for all commercially feasible fields of use."
(Exhibit 1 at § 8.3.)

165.   To the extent that AstraZeneca ceased using the MASTER STRAINS in connection with FluMist®, AstraZeneca breached the Agreement by, among other things:

a.   Failing to use the MASTER STRAINS to develop and manufacture PRODUCTS;

b.   Failing to use best efforts to manufacture and market PRODUCTS;

c.   Failing to use best efforts to commercialize PRODUCTS for all commercially feasible fields of use.

166.   AstraZeneca concealed these breaches from the University by means of its affirmative acts and representations.  Specifically, AstraZeneca paid royalties and delivered royalty reports to the University, which represented that AstraZeneca was complying with the Agreement provisions limiting AstraZeneca's use of the MASTER STRAINS even though AstraZeneca had breached those provisions.

167.   The University has been harmed by AstraZeneca's breaches of contract.

168.   The University is entitled to damages as a result of AstraZeneca's breaches of contract.

34

## COUNT VI (UNJUST ENRICHMENT)

169.   The University incorporates the foregoing allegations as if fully restated herein.

170.   The University conveyed a benefit on AstraZeneca by permitting it to use the MASTER STRAINS and other personal property to develop FluMist® into a successful commercial product.

171.   AstraZeneca continues to use the MASTER STRAINS and other personal property belonging to the University to develop, manufacture, market, and sell FluMist®.

172.   AstraZeneca has generated billions of dollars in revenue made possible only by the benefit it received from the University of Michigan.

173.   The benefit the University provided to AstraZeneca also enabled AstraZeneca to make and benefit from improvements to FluMist®.

174.   Since the Agreement expired as of September 30, 2023, there is no written contract governing AstraZeneca's post-2023 retention of benefits received from the University.

175.   Since 2023, AstraZeneca has failed to compensate the University for the ongoing benefits the University provided.

176.  It would be unjust for AstraZeneca to retain the benefits provided by the University without further compensation.  In particular, AstraZeneca should be required to disgorge any profits obtained from its post-2023 sales of FluMist®.

## PRAYER FOR RELIEF

WHEREFORE, for the foregoing reasons, the University of Michigan respectfully requests that the Court award it the following relief:

1.  Judgment in its favor and against AstraZeneca on all causes of action;

2.  Damages sufficient to compensate the University for the injuries it has suffered in contract and tort;

3.  Treble damages for AstraZeneca's conversion of the University's property;

4.  Disgorgement of all profits and benefits receive or retained by AstraZeneca in any way connected to the use of the University's property, including all profits from FluMist® earned by AstraZeneca since 2023;

5.  Imposing a constructive trust over the MASTER STRAINS, the TECHNOLOGICAL DATA, and the IMPROVEMENTS to preserve their value and prevent their destruction;

6.  An order requiring AstraZeneca to deliver complete possession of the MASTER STRAINS and all derivatives to the University;

36

7.      Specific performance of the Agreement, including requirement that AstraZeneca:

      a.      Return the MASTER STRAINS,

      b.      Deliver the IMPROVEMENTS, and

      c.      Deliver the TECHNOLOGICAL DATA;

8.      A full accounting of AstraZeneca's use of the MASTER STRAINS, including all derivatives thereof, and its creation of IMPROVEMENTS and TECHNOLOGICAL DATA;

9.      A permanent injunction preventing AstraZeneca from any continued use, direct or indirect, of the MASTER STRAINS or other property belonging to the University without a license; and

10.      All other legal or equitable relief that is just and proper.

                  Respectfully submitted,

                  HONIGMAN LLP
                  Attorneys for Plaintiff

                  By: */s/ J. Michael Huget*
                    J. Michael Huget (P39150)
                    Andrew W. Clark (P79165)
                    Yafeez S. Fatabhoy (P83064)
                    315 E. Eisenhower, Pkwy., Suite 100
                    Ann Arbor, MI 48108
                    734-418-4200

Dated:  August 26, 2025

38